W.F.J., INC., Plaintiff,

v.

The BANK OF TIOGA, Defendant,

The BANK OF TIOGA, Plaintiff,

v.

W.F.J., INC.; Waconia Manufacturing
Industries, Inc.; and Tioga Air
Heaters, Inc., Defendants.

Civ. Nos. A4–84–62, A4–84–70.

United States District Court,
D. North Dakota,
Northwestern Division.

Dec. 18, 1984.

Malcolm H. Brown, Bair, Brown &
Kautzmann, Mandan, N.D., for Bank of
Tioga.

John C. Thomas, Mark P. Wine, Oppen-
heimer, Wolff, Foster, Shepard & Donnelly,
Minneapolis, Minn., Richard P. Olson, Mi-
not, N.D., for W.F.J., Inc. and Waconia
Mfg. Industries, Inc.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

The above-captioned cases were consoli-
dated by order dated May 2, 1984. Pursu-
ant to F.R.Civ.P. 56, The Bank of Tioga has
moved for summary judgment in its favor.
W.F.J., Inc. (W.F.J.) and Waconia Manufac-
turing Industries, Inc. (Waconia) have also
moved for summary judgment in their fa-
vor.

### FACTS

The sole issue in this controversy is
which party has the superior security inter-

est in equipment, valued at approximately $350,000, owned by Tioga Air Heaters, Inc. (Tioga Inc.), a corporation which is now inactive. Both parties seek declaratory relief on the issue of priority of security interests.

Tioga Inc. was formed in March, 1979 when Tioga Air Heaters Co. (Tioga Co.) and Flame Industries of North Dakota, Inc. (Flame-North Dakota) merged. (Nelson Affidavit, Ex. L). Flame-North Dakota was the sole stockholder of Tioga Inc. at the time of the merger. Flame-North Dakota's sole stockholder at the time of the merger was Flame Industries, Inc. (Flame-Minnesota), a Minnesota corporation.

This dispute follows a series of transactions among the various parties. On April 29, 1977, Flame-Minnesota and The First National Bank of St. Paul (First St. Paul) entered into an agreement entitled "$750,-000 Term Loan Agreement". Terms of that agreement prohibited Flame-Minnesota from incurring any liens or encumbrances on its property (other than that granted to First St. Paul), from incurring debt in excess of $100,000 in any year without prior written consent of First St. Paul, and from guaranteeing the obligations of any person or corporation. (Serviss Affidavit, Ex. A).

On July 26, 1979, First St. Paul and Tioga Co. entered into a security agreement. (Nelson Affidavit, Ex. J). Even though this followed Tioga Co.'s merger into Tioga Inc., both the security agreement and the financing statement referred to the debtor as Tioga Co. The security agreement was a printed form, which at the top was captioned:

SECURITY AGREEMENT

Equipment

The agreement then recited that:

The undersigned (hereinafter called "Borrower") hereby grants to The First National Bank of Saint Paul—Saint Paul, Minnesota (hereinafter called "Bank") a Security Interest in the following described property (hereinafter called "Collateral"):

[BLANK]

together with ... all other Equipment (as that term is defined in the Uniform Commercial Code) hereinafter at any time acquired by Borrower or in which Borrower obtains rights;

All property of every kind and description in which the Borrower has or may acquire any interest now or hereafter at any time in the possession or control of the Bank for any reason ... and

All Proceeds of all of the foregoing....

(Nelson Affidavit, Ex. J). On August 10, 1979, First St. Paul filed a financing statement with the North Dakota Secretary of State in which First St. Paul claimed a security interest in "[a]ll [e]quipment now owned and hereafter acquired" by Tioga Co. (Nelson Affidavit, Ex. A).

In February, 1980, Bank of Tioga began providing financing to Tioga Inc. A February 15, 1980 security agreement between Bank of Tioga and Tioga Inc., by its terms, gave Bank of Tioga a security interest in "[a]ll equipment and machinery, including power-driven machinery and equipment ... now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, parts and tools belonging thereto or for use in connection therewith." (Nelson Affidavit, Ex. B, *see* Appendix A attached hereto). On February 22, 1980, Bank of Tioga filed a financing statement with the North Dakota Secretary of State, claiming a security interest in "all equipment and machinery" of Tioga Inc., as described in the February 15, 1980 security agreement. (Nelson Affidavit, Ex. C).

A letter dated March 25, 1980, from First St. Paul to Flame-Minnesota included the following statement with respect to provisions of First St. Paul's April 29, 1977 loan agreement with Flame-Minnesota:

We hereby agree to waive Section 4A and 4B of the loan agreement dated April 29, 1977, as amended March 28, 1980, between Flame Industries, Inc. (Flame)

and the First National Bank of St. Paul on the following terms:

We agree to a waiver of Flame[Minnesota] granting a First Security Interest to the Bank of Tioga, Tioga, North Dakota and the Small Business Administration and certain collateral described in the loan agreement with a total transaction cost of $350,000.

(Nelson Affidavit, Ex. E). Section 4A of the April 29, 1977 loan agreement is Flame-Minnesota's covenant not to incur any liens or encumbrances upon any of its property, other than its lien to First St. Paul or properly perfected purchase money security interests in equipment. (Serviss Affidavit, Ex. A at 13). Section 4B is Flame-Minnesota's covenant not to incur outstanding indebtedness in excess of $100,000 in any one fiscal year without prior written consent of First St. Paul. (Serviss Affidavit, Ex. A at 14).

Bank of Tioga asserts the March 25, 1980 letter was a waiver of First St. Paul's priority lien. W.F.J. and Waconia assert it was merely a waiver of the restrictions of the First St. Paul/Flame-Minnesota loan agreement in which Flame-Minnesota agreed not to incur, assume, or guarantee any debts other than those to First St. Paul. W.F.J. and Waconia argue this waiver was necessary because Tioga Inc., as a wholly owned subsidiary of Flame-Minnesota, was an asset of Flame-Minnesota. W.F.J. and Waconia contend that the reference to granting a first security interest to Bank of Tioga was a reference to allowing Tioga Inc. to grant a purchase money security interest to Bank of Tioga for specific equipment purchased with the $350,000 loan from Bank of Tioga.

In May, 1982, First St. Paul acquired a security interest in certain property of Tioga Inc. On May 19, 1982, First St. Paul filed a financing statement with the North Dakota Secretary of State, claiming a security interest in that property specifically described in an attachment to the financing statement. (Nelson Affidavit, Ex. K). The May 19, 1982 financing statement is not involved in the current dispute.

By notice dated January 18, 1984, First St. Paul notified Bank of Tioga that, because of Tioga Inc.'s default on its obligations, First St. Paul would dispose of the collateral in which it claimed a security interest. (Nelson Affidavit, Ex. F). W.F.J., a new corporation formed to purchase Tioga Inc.'s assets, purchased the property (accounts receivable, inventory, and general tangibles) of Tioga Inc. from First St. Paul on January 31, 1984 for $650,000. (Nelson Affidavit, Ex. O, ¶ V). Waconia is a successor transferee of W.F.J.

## DISCUSSION

Because they succeeded to First St. Paul's interest, the rights of W.F.J. and Waconia to the property of Tioga Inc. are wholly dependent on the rights of First St. Paul. The respective rights of Bank of Tioga and First St. Paul are dependent on the validity of the 1979 security agreement and financing statement.

Bank of Tioga argues that the 1979 financing statement was deficient because it was based on a security agreement which did not adequately describe the secured property. N.D.Cent.Code § 41–09–10 (1983) provides:

[A]ny description of personal property ... whether or not it is specific is sufficient for purposes of this chapter if it reasonably identifies what is described.

N.D.Cent.Code § 41–09–16 (1983) provides that a security interest is not enforceable unless, *inter alia:*

[T]he debtor has signed a security agreement which contains a description of the collateral. . . .

First St. Paul asserts that the 1979 security agreement's caption "Equipment" was sufficient description under these statutes.

■ It is clear that the security agreement form used in the 1979 security agreement was designed to accommodate an individualized description of the secured property. It is also clear that First St. Paul made no attempt to give a specific description of the property in the security agreement. But that security agreement can be

examined together with the financing statement to determine sufficiency of description. It is the purpose of the financing statement to give notice to other parties of the security interest claimed by the creditor. In the 1979 financing statement at issue here, First St. Paul claimed a security interest in "[a]ll equipment now owned or hereafter acquired." That description was sufficient to give notice of First St. Paul's claim to interested parties. *See U.S. v. First National Bank in Ogallala, Neb.,* 470 F.2d 944 (8th Cir.1973) ("all farm and other equipment now owned or hereafter acquired" was sufficient description in security agreement); *In Re Sarex Corp.,* 509 F.2d 689 (2d Cir.1975) ("machinery and equipment" was sufficient description of collateral in security agreement). Indeed, Bank of Tioga was aware of First St. Paul's claimed security interest at the time it made the 1980 loan to Tioga Inc. (Nelson Affidavit). The security agreement and financing statement reasonably identified what was described.

■ Bank of Tioga also argues that the 1979 financing statement and security agreement were deficient because both listed the debtor as "Tioga Air Heaters Co." rather than "Tioga Air Heaters, Inc." N.D.Cent.Code § 41–09–41(8) (1983), governing the formal requisites of financing statements, provides:

> A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

Since both "Tioga Air Heaters Co." and "Tioga Air Heaters, Inc." had been used as corporate names, use of the wrong corporate name was potentially misleading. It is clear, however, that Bank of Tioga was not misled. Bank of Tioga was familiar with the formation of Tioga Inc. and with the history of Tioga Co. More importantly, Bank of Tioga was aware of the financing statement. Under these circumstances, this Court cannot find the financing statement deficient for use of the name "Tioga Air Heaters Co." rather than "Tioga Air Heaters, Inc." *See, e.g., In Re Colorado Mercantile Company,* 299 F.Supp. 55 (D.Colo.1969) (financing statement identifying creditor as "O.M. Scott Credit Corporation" rather than "O.M. Scott & Sons Co." was not seriously misleading).

This Court finds that the 1979 security agreement and financing statement gave First St. Paul a perfected security interest in the equipment of Tioga Inc. Since Bank of Tioga acquired its interest subsequent in time, First St. Paul's security interest had priority over Bank of Tioga's.

Bank of Tioga argues that if First St. Paul had a valid security interest in the equipment of Tioga Inc., Bank of Tioga should nonetheless prevail because First St. Paul subordinated its interest to Bank of Tioga. Bank of Tioga bases its subordination argument on the March 25, 1980 letter from First St. Paul to Flame-Minnesota.[1] That letter by itself is not, however, sufficient to support Bank of Tioga's position.

The March 25, 1980 letter from First St. Paul to Flame-Minnesota unambiguously refers to Sections 4A and 4B of the parties' April 29, 1977 loan agreement. The letter was an effective waiver of certain restrictions on Flame-Minnesota's financial dealings imposed by the loan agreement. The letter, though it refers to granting a first security interest to Bank of Tioga and the Small Business Administration, is not sufficient to constitute a subordination of First St. Paul's first lien in *all equipment* of Tioga Inc. The second portion of the letter states:

> We agree to a waiver of Flame[Minnesota] granting a First Security Interest to the Bank of Tioga, Tioga, North Dakota and the Small Business Administration and certain collateral described in the

---

1. Bank of Tioga, by affidavit, stated that it "had telephone conversations with personnel at [First] St. Paul regarding their subordinating their security interest in equipment and machinery to The Bank of Tioga." The affidavit does not, however, actually state that an agreement to subordinate was reached.

loan agreement with a total transaction cost of $350,000.

(Nelson Affidavit, Ex. E, *see* Appendix B attached hereto).

■ The letter is addressed to Flame-Minnesota and gives Flame-Minnesota permission to grant a first lien in certain collateral to Bank of Tioga. The second portion of the letter specifies terms of First St. Paul's waiver of the restrictions imposed on Flame-Minnesota by the April 29, 1977 loan agreement. The plain language of the letter allows Flame-Minnesota to allow Tioga Inc. to grant a purchase money security interest in equipment valued at $350,000 to Bank of Tioga. The phrase "certain collateral described in the loan agreement with a total transaction cost of $350,000" cannot encompass the entire collateral pledged in the First St. Paul security agreement because that security agreement envisioned a $750,000 line of collateral, and the scope of the waiver in favor of Bank of Tioga is limited to $350,000. Bank of Tioga does not argue that it actually perfected a purchase money security interest in specified equipment; a selection of specific equipment of a value not to exceed $350,000 would have been necessary in order for Bank of Tioga to effectively exercise the option given it by the plain language of the letter. The March 25, 1980 letter does not subordinate First St. Paul's security interest to Bank of Tioga.

This Court concludes that First St. Paul held a valid security interest superior to that of Bank of Tioga and that that security interest was not subordinated. Since W.F.J. and Waconia succeeded to the rights of First St. Paul, W.F.J.'s and Waconia's interests in the equipment of Tioga Inc. are superior to that of Bank of Tioga.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED:

1). That the motion for summary judgment in favor of The Bank of Tioga is denied.

2). That the motion for summary judgment in favor of W.F.J., Inc. and Waconia Manufacturing Industries, Inc. is granted.

## APPENDIX A

### Small Business Administration

#### SECURITY AGREEMENT

1.  _____TIOGA AIR HEATERS, INC._____ (hereinafter called "Debtor"),
     (Name)

    _____TIOGA, NORTH DAKOTA 58852_____ , for value received,
     (Address)

hereby grants to _____THE BANK OF TIOGA_____
     (Name)

    _____TIOGA, NORTH DAKOTA 58852_____ _____ (hereinafter called

"Secured Party"), a security interest in the property described below (hereinafter collectively called "Collateral") to secure the payment of the principal and interest on and all obligations under a note (hereinafter called the "Note"), dated _____February 15, 1980_____ , of the Debtor payable to the order of the Secured Party, in the principal amount of _____Three hundred Fifty thousand and no/100_____ Dollars ($ 350,000 00 ), all renewals and extensions of the Note, and all costs, expenses, advances and liabilities which may be made or incurred by Secured Party in the disbursement, administration and collection of the loan evidenced by the Note and in the protection, maintenance and liquidation of the security interest hereby granted with interest, at the maximum legal rate on such costs, expenses, advances and liabilities. The Note and all other obligations secured hereby are herein collectively called the "Liabilities."

2. The Collateral in which this security interest is granted is all of the Debtor's property described below in reference to which an "X" or checkmark has been placed in the box applicable thereto, together with all proceeds and products therefrom. If two such boxes are so marked, the security interest so designated secures the purchase money from the loan used by the Debtor to acquire title to the Collateral.

**XX** **XX**    a. All equipment and machinery, including power-driven machinery and equipment, furniture and fixtures now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, parts and tools belonging thereto or for use in connection therewith.

☐ ☐    b. All passenger and commercial motor vehicles registered for use upon public highways or streets, now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, parts, equipment and tools belonging thereto or for use in connection therewith.

☐ ☐    c. All inventory, raw materials, work in process and supplies now owned or hereafter acquired.

☐ ☐    d. All accounts receivable now outstanding or hereafter arising.

☐ ☐    e. All contract rights now in force or hereafter acquired.

3. Debtor shall not transfer, sell or assign Debtor's interest in the Collateral nor permit any other security interest to be created thereon without Secured Party's prior written approval, except that Debtor may sell the inventory listed in Paragraph 2.c. hereof in the ordinary course of business on customary terms and at usual prices and may collect as Secured Party's agent sums due on accounts receivable and contract rights listed in Paragraphs 2.d. and 2.e. until advised otherwise by Secured Party.

4. Debtor shall keep, store or regularly garage all Collateral at locations approved by Secured Party in writing:

5. Debtor shall not conduct business under any other name than that given above nor change or reorganize the type of business entity under which it does business except upon prior written approval of Secured Party. If such approval is given, Debtor guarantees that all documents, instruments and agreements demanded by Secured Party shall be prepared and filed at Debtor's expense before such change of name or business entity occurs.

6. Debtor shall pay the filing and recording costs of any documents or instruments necessary to perfect, extend, modify, or terminate the security interest created hereunder, as demanded by Secured Party.

7. Debtor shall maintain all Collateral in good condition, pay promptly all taxes, judgments, or changes of any kind levied or assessed thereon, keep current all rent due on premises where Collateral is located, and maintain insurance on all Collateral against such hazards, in such amounts and with such companies as Secured Party may demand, all such insurance policies to be in the possession of Secured Party and to contain a Lender's Loss Payable Clause naming Secured Party in a manner satisfactory to Secured Party. Debtor hereby assigns to Secured Party any proceeds of such policies and all unearned premiums thereon, and authorizes and empowers Secured Party to collect such sums and to execute and endorse in Debtor's name all proofs of loss, drafts, checks and any other documents necessary to accomplish such collections, and any persons or entities making payments to Secured Party under the terms of this Paragraph are hereby relieved absolutely from any obligation to see to the application of any sums so paid.

8. Debtor shall be in default hereunder if Debtor fails to perform any of the liabilities imposed hereby or any other obligation required by the various instruments or papers evidencing or securing this loan, or if the full balance of the loan becomes immediately payable under the terms of such instruments, either automatically or by declaration of the Secured Party. In the event of any default, Secured Party may, in its own discretion, cure such default and, if it does so, any expenditures made for such purpose shall be added to the principal of the Note.

9. In the event of default, Debtor shall assemble and make available all Collateral at any place designated by Secured Party. Debtor acknowledges being advised of a constitutional right to a court notice and hearing to determine whether, upon default, there is probable cause to sustain the validity of the Secured Party's claim and whether the Secured Party is entitled to possession of the Collateral and being so advised, Debtor hereby voluntarily gives up, waives and surrenders any right to a notice and hearing to determine whether there is probable cause to sustain the validity of Secured Party's claim. Any notices required pursuant to any state or local law shall be deemed reasonable if mailed by Secured Party to the persons entitled thereto at their last known addresses at least ten days prior to disposition of the Collateral, and, in reference to a

private sale, need state only that Secured Party intends to negotiate such a sale. Disposition of Collateral shall be deemed commercially reasonable if made pursuant to a public offering advertised at least twice in a newspaper of general circulation in the community where the Collateral is located or by a private sale for a sum equal to or in excess of the liquidation value of the Collateral as determined by Secured Party.

10. All rights conferred on Secured Party hereby are in addition to those granted to it by any state or local law or any other law. Failure or repeated failure to enforce any rights hereunder shall not constitute an estoppel or waiver of Secured Party's rights to exercise such rights accruing prior or subsequent thereto. Secured Party shall not be liable for any loss to Collateral in its possession, nor shall such loss diminish the debt due, even if the loss is caused or contributed to by Secured Party's negligence.

IN WITNESS WHEREOF, _____

In the event that Loan becomes delinquent or (Bank/SBA) feels itself insecure, (Bank/SBA) may, at its option, require that Borrower deposit all proceeds from sale of inventory or from accounts receivable in a cash collateral account to be established at participating bank.

DATE:   February 15, 1980

TIOGA AIR HEATERS, INC.

_____
Ernest R. Muckelrath, Vice President

_____
Calvin C. Serviss, Vice President

## APPENDIX B

The First National Bank
of Saint Paul
332 Minnesota Street
Saint Paul, Minnesota 55101
Wholesale Banking Group—Division A
Loans and Account Relationships
Metropolitan Twin Cities Area and
Midwestern United States

March 25, 1980

Mr. Calvin C. Serviss
Vice President—Finance
Flame Industries, Inc.
122 Columbia Court North
Jonathan Industrial Park
Chaska, Minnesota 55318

Dear Cal:

We hereby agree to waive Section 4A and 4B of the loan agreement dated April 29, 1977, as amended March 28, 1980, between Flame Industries, Inc. (Flame) and The First National Bank of St. Paul on the following terms:

We agree to a waiver of Flame granting a First Security Interest to the Bank of Tioga, Tioga, North Dakota and the Small Business Administration and certain collateral described in the loan agreement with a total transaction cost of $350,000.

Sincerely,

/s/ Dennis K. Dingman
Dennis K. Dingman
Assistant Vice President

DKD/ml